UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

───────────────────────────────────

KYLE A. BOX,

                Petitioner,

      v.                                 9:22-CV-1093
                                                 (DNH)
LYNN LILLEY, Superintendent,
Eastern Correctional Facility,

                Respondent.

───────────────────────────────────

APPEARANCES:                             OF COUNSEL:

KYLE A. BOX
Petitioner, Pro Se
17-B-0695
Eastern NY Correctional Facility
Box 338
Napanoch, NY 12458

HON. LETITIA JAMES                     PRISCILLA I. STEWARD, ESQ.
Attorney for Respondent               Ass't Attorney General
28 Liberty Street
New York, NY 10005

DAVID N. HURD
United States District Judge

## DECISION and ORDER

## I. INTRODUCTION

    *Pro se* petitioner Kyle Box ("Box" or "petitioner") seeks federal habeas corpus relief

pursuant to 28 U.S.C. § 2254.  Dkt. No. 1, Petition ("Pet."); Dkt. No. 1-1 at 1-11, Petitioner's

Supporting Affidavit ("Pet. Aff."); Dkt. No. 1-1 at 12-45, Exhibits ("Ex.").[1]  After an initial

review, respondent was directed to answer the petition.  Dkt. No. 7, Decision and Order

("November Order").

Before respondent filed an answer, petitioner moved to provide additional information

to supplement his petition.  Dkt. No. 11, Motion.  But that motion was denied because it was

unnecessary at that time—respondent had already been directed to file all of the relevant

information as part of the answer, including the State Court Record and any applicable state

court transcripts.  Dkt. No. 12, Text Order.  Those documents were likely to include some, if

not all, of the information which petitioner sought to provide in his request to further support

his pleading.  *Id*.  However, petitioner was reminded that he would have a further opportunity

to submit additional information in reply to respondent's answer.  *Id*.

Thereafter, respondent moved for permission to file a limited answer addressing only

the issue of timeliness.  Dkt. No. 15, Motion; Dkt. No. 16, State Court Record ("SCR"); Dkt.

No. 16-1, State Court Transcripts; Dkt. No. 17, Steward Affidavit.  That request was granted,

and petitioner was provided with an opportunity to file a reply arguing why this action should

not be dismissed as time-barred.  Dkt. No. 18, Text Order.  Petitioner filed a reply, along with

a motion requesting permission to file various additional motions for further evidence testing,

expert review of evidence, and the appointment of counsel.  Dkt. No. 20, Traverse; Dkt. No.

21, Motions.

---

[1]  For the sake of clarity, and with one limited exception, citations to parties' filings refer to the pagination generated by CM/ECF, the Court's electronic filing system.  The State Court Record, Dkt. No. 16, has its own separate consecutive pagination, a Bates-stamped "SR" number in the center of the bottom of each page.  Citation to the State Court Record will instead refer to that three-digit "SR" number as opposed to the page number in the header at the top-left hand corner of each page with the Court's electronic filing system produces.

## II. BACKGROUND

### A. Conviction and Direct Appeal

Box's 2017 judgment of "conviction stems from his conduct in stabbing the victim 46 times in the victim's home, setting fire to the house, and then stealing the victim's vehicle. [Petitioner] gave a statement to the police admitting that he stabbed the victim, but claimed he did so in self-defense." *People v. Box*, 181 A.D.3d 1238, 1238 (4th Dep't 2022).[2, 3]

Box filed a counseled direct appeal challenging this criminal conviction.  SCR at 159-235.  The Fourth Department unanimously modified the conviction on the law and the facts, reversing petitioner's convictions for third degree arson, first degree reckless endangerment, fourth degree grand larceny, and fourth degree criminal possession of stolen property and dismissing counts four, five, eight and nine of the indictment.  *Box*, 181 A.D.3d at 1238-39. However, petitioner's convictions for second degree murder, first degree assault, second degree arson, and two counts of tampering with physical evidence were affirmed.  *Id.* at 1239.

Box applied for leave to appeal to the New York State Court of Appeals.  SCR at 610-13 (counseled application); SR 614-14 (pro se supplemental brief in support of application). The Court of Appeals denied petitioner's application on June 10, 2020.  *People v. Box*, 35

---

[2] To the extent a more specific factual recitation is needed, it will be included in the Discussion section with appropriate citations to the State Court Record and state court transcripts.

[3] Petitioner included a copy of the Fourth Department's decision in his exhibits. Ex. at 12-14.  Respondent also included a copy of the decision in the State Court Record.  SR 604-609.

N.Y.3d 1025 (2020).[4, 5]

Box also filed a *pro se* application for a writ of certiorari with the United States Supreme Court on October 19, 2020.  SCR at 619-645.  That application was denied on January 11, 2021.  *Box v. New York*, 141 S. Ct. 1090 (2021).[6]

### B. **440 motion**

On October 13, 2020, Box's appellate counsel wrote him a letter indicating that she had filed a motion with the county court requesting that she be assigned to represent petitioner for the collateral challenge to his conviction (which he intended to file) pursuant to New York Criminal Procedure Law § 440.10 ("440 motion").  Ex. at 19.

On December 7, 2020, Box's appellate counsel wrote him a second letter, explaining that the county court had denied the application and explaining that she could not "help [petitioner] with [his] motion unless [he] were to hire [her] to do so."  Ex. at 20.

---

[4]  Petitioner included a copy of the Court of Appeals' decision in his exhibits.  Ex. at 15.  Respondent also included a copy of the decision in the State Court Record.  SR 618.

[5]  Petitioner's appellate counsel also sent him a letter explaining that the Court of Appeals had denied his direct appeal.  Ex. at 18.  In that letter, petitioner's attorney explained the three remaining options for challenging his state court conviction: (1) bring a 440 motion; (2) seek direct review via the Supreme Court; or (3) file an application for federal habeas relief.  *Id.*
    Regarding a 440 motion, petitioner's attorney indicated that they had previously discussed a potential 440 action and ground upon which it could be argued.  Ex. at 18.  Specifically, the attorney said "if [petitioner's trial] attorney pursued the extreme emotional disturbance defense over [his] objection, that may be a ground to challenge [his] conviction;" however, if petitioner agreed to the strategy and it "failed or . . . there may have been a better/different defense strategy available," such arguments would not be sufficient to sustain a 440 motion.  *Id.*  The appellate attorney concluded that"[w]ithout identifying a specific non-frivolous ground to bring a 440 motion, [she] cannot help [petitioner] prepare one."  *Id.*
    Finally, with respect to the federal habeas action, the appellate attorney stated that petitioner "must file [a] writ within one year and 90 days of the Order denying leave to appeal," and stressed the "strict time limitations to [petitioner's] ability to pursue th[at] option."  Ex. at 18 (emphasis in original).  Further, the attorney directed petitioner to a resource for further information on how to go about bringing a petition.  *Id.*  However, the second page of the letter was not included in the Exhibits, therefore, the Court is unable to determine what specific resource(s) or advice was provided to petitioner.

[6]  Petitioner included a copy of the Supreme Court's decision in his exhibits.  Ex. at 17.  Respondent also included a copy of the decision the State Court Record.  SR 652.

On March 12, 2021, the Jefferson County Court sent to petitioner a letter in which it (1) acknowledged receipt of his correspondence dated February 18, 2021, and (2) sought clarification on whether the letter was intended to be a formal motion for assignment of counsel and funds for a private investigator or an application for poor person status.  Ex. at 21.

On March 19, 2021, Box filed a "[m]otion for post[-]conviction relief . . . as a poor person for assignment of counsel to perfect a 440 . . . motion , and fund[s to hire a] private investigator."  SCR at 1; *see also* Pet. Aff. at 2 (explaining that petitioner filed a "[p]ost conviction relief motion . . . requesting appointment of counsel, and a forensic specialist/investigation . . . [a]ll in order to file a CPL 440.10 motion properly.").

On May 13, 2021, the Jefferson County Court denied petitioner's motion.  SCR at 28-33.[7]  Specifically, the court held that petitioner (1) would only be entitled to appointment of counsel for a 440 motion in the event a hearing was ordered, however "[n]o such [440] motion has been brought [in county court]; and therefore, a hearing has not been ordered," and (2) "has failed to provide sufficient factual information for the Court to consider the request for an investigator.  More specifically, [petitioner] has failed to proffer the name of the expert requested; the anticipated scope of the services to be performed; and/or the amount of funds requested for such services."  SCR at 32.

Petitioner filed a pro se 440 motion in Jefferson County Court dated September 20, 2021.  SCR at 34-68.[8]  On or about November 3, 2021, the 440 motion was denied.  SCR at

---

[7]  Petitioner included a copy of the county court decision in his exhibits.  Ex. at 22-27.

[8]  The undersigned notes that petitioner's supporting affidavit is dated August 20, 2021, SCR at 35; however, both conclusion pages to the motion are signed and dated by petitioner on "Sep. 20, 2021," SCR at 64-65. According, the undersigned reasonably concludes that petitioner authored the 440 motion in September.

94-103; Pet. Aff. at 3.[9]  Petitioner filed a pro se application seeking leave to appeal, which the Fourth Department denied on May 2, 2022.  SCR at 104-105 (appeal application); SCR at 106-107 (Appellate Division's decision).[10]

Petitioner then filed a second pro se application for leave to appeal to the Court of Appeals, which was dismissed on September 26, 2022, "because the order sought to be appealed from is not appealable under C.P.L. § 450.90(1)."  SCR at 152; *accord People v. Box*, 38 N.Y.3d 1187 (2022).[11]  Petitioner filed a pro se motion for reconsideration of the September 2022 decision, which the Court of Appeals denied on November 30, 2022.  SCR at 153-54 (reconsideration motion); SCR at 158 (Court of Appeals decision); *accord People v. Box*, 39 N.Y.3d 961 (2022).

### C. <u>Correspondence with the Northern District of New York</u>

On June 30, 2021, this Court received a letter from the petitioner expressing concern that the statutory limitations period was about to expire and "asking . . . for either an extension [of time] for leave to appeal, or a clarification on whether [his] 440 . . . motion counts," and further inquiring whether petitioner "should . . . file a motion for leave to appeal alongside [his] other state avenues."  Ex. at 28-29.  Petitioner indicated that his letter was a "request to extend [his] right to appeal to th[e Northern District of New York.]"  Ex. at 29.

This Court responded, via a letter from the Clerk's Office, on July 2, 2021, explaining that petitioner's submission could not be accepted because it (1) does not relate to an existing case or (2) operate to open a new case.  Ex. at 28.  Accordingly, the Court made

---

[9]  Petitioner included a copy of the county court decision in his exhibits.  Ex. at 30-39.

[10]  Petitioner included a copy of the Fourth Department's decision in his exhibits.  Ex. at 41.

[11]  Petitioner included a copy of the Court of Appeals decision in his exhibits.  Ex. at 43.

clear that petitioner did not have a case pending in the Northern District and had not properly commenced one as a result of his letter.  *Id.*  Further, the Court stated that it did not provide legal advice to parties.  *Id.*

## III.  **PETITION**

Box's current petition challenges his 2017 judgment of conviction in Jefferson County, upon a jury verdict, of second degree murder, first degree assault, second degree arson, and two counts of tampering with physical evidence.  Pet. at 5-6.

Box contends that he is entitled to federal habeas relief because (1) petitioner's trial counsel was constitutionally ineffective, Pet. at 9-11; (2) petitioner's conviction was against the weight of the evidence, *id.* at 11-12; (3) petitioner was subjected to a malicious prosecution because of the bad faith actions of law enforcement officers, *id.* at 12-13; (4) the prosecution illegally used law witness testimony when law enforcement acted as summation witnesses, *id.* at 14-15; (5) new evidence supports petitioner's claim of actual innocence via self-defense, *id.* at 15-17; and (6) petitioner's trial was so fundamentally unfair it violated his constitutional rights, *id.* at 17-18.

## IV.  **DISCUSSION**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), enacted on April 24, 1996, established a one-year statute of limitations for prisoners to seek federal review of their state court criminal convictions.  28 U.S.C. § 2244(d)(1).  The one-year period generally begins to run from the date on which the state criminal conviction became final by the conclusion of direct review or by the expiration of the time to seek direct review.  28

U.S.C. § 2244(d)(1)(A); *Gonzalez v. Thaler*, 565 U.S. 134, 149-50 & n.9 (2012).[12]  More specifically, that date is when the United States Supreme Court denies an application for a writ of certiorari or when the time to seek certiorari has expired, which is ninety days after the date on which the highest court in the state has completed direct review of the case. *Gonzalez*, 565 U.S. at 150; *Saunders v. Senkowski*, 587 F.3d 543, 547-49 (2d Cir. 2009).

Importantly, Box's criminal conviction became final when the Supreme Court denied petitioner's application for a writ of certiorari on January 11, 2021.[13]  SCR at 652; *Gonzalez*, 565 U.S. at 150; *Saunders*, 587 F.3d at 547-49.  Petitioner had one year from that date, or until January 11, 2022, to timely file his habeas petition.  28 U.S.C. §2244(d)(1); *Saunders v. Senkowski*, 587 F.3d 543, 548-49 (2d Cir. 2009).  But the petition was not filed until October 18, 2022.  Pet. at 21.[14]  That is over nine months beyond the expiration of the one-year limitations period.  Accordingly, this petition is untimely unless tolling principles or an equitable exception applies.

---

[12]  Other dates from which the limitations period may start running are the date on which an unconstitutional, state-created impediment to filing a habeas petition is removed, the date on which the constitutional right on which the petitioner bases his habeas application was initially recognized by the Supreme Court, if the right was newly recognized and made retroactively applicable, or the date on which the factual predicate for the claim or claims presented could have been discovered through the exercise of due diligence (newly discovered evidence). 28 U.S.C. § 2244(d)(1)(B)-(D).  However, none of these alternate accrual dates are relevant to the instant action.

[13]  In light of the global pandemic, the Supreme Court issued a general order declaring that for a lower court decision filed between March 19, 2020, and July 18, 2021, the deadline for applying for certiorari would be temporarily extended from ninety to 150 days.  See 334 F.R.D. 801 (U.S. Mar. 19, 2020), available at https://www.supremecourt.gov/orders/courtorders/031920zr_d1o3.pdf (extending deadline); U.S. Sup. Ct. Orders Rescinded, 28 U.S.C. (U.S. July 19, 2021), available at https://www.supremecourt.gov/orders/courtorders/071921zr_4g15.pdf (rescinding pandemic-instituted protocols). The Court of Appeals denied petitioner's application for his direct appeal on June 10, 2020, SCR at 618; accordingly, petitioner took advantage of the extended deadline and successfully applied for a writ of certiorari on October 19, 2020, SCR at 619-645.

[14]  Under the prison "mailbox rule," a petitioner's application is deemed filed on the date he delivers it to the prison authorities for mailing.  *Houston v. Lack*, 487 U.S. 266, 270 (1988)

A. <u>Statutory Tolling</u>

The one-year limitations period under AEDPA is statutorily tolled while "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2); *Saunders*, 587 F.3d at 548. This statutory tolling provision "excludes time during which properly filed state relief applications are pending, but does not reset the date from which the one-year statute of limitations begins to run." *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (per curiam). The tolling provision excludes from the limitations period only the time that the state relief application remained undecided, including the time during which an appeal from the denial of the motion was taken. *Saunders*, 587 F.3d at 548; *Smith*, 208 F.2d at 16.

Box argues that statutory tolling should begin in February of 2021, when he first sent correspondence to the Jefferson County Court regarding his poor person application and his request to be appointed counsel and provided funds for an investigator. Dkt. No. 20 at 7. Petitioner emphatically asserts that these motions constituted a direct challenge to his conviction and respondent's arguments to the contrary are inaccurate. *Id.* at 8; *see also* Dkt. No. 19 at 3-4. Petitioner claims his conclusion is illustrated by his request for "any and all post-conviction relief possible" because, according to petitioner, it is universally understood that a request to enlist an investigator or attorney would only be for the purpose of challenging a state court conviction. Dkt. No. 20 at 8.

Governing precedent forecloses this argument. The Supreme Court has explained that "'collateral review' of a judgment or claim means a judicial reexamination of a judgment or claim in a proceeding outside of the direct review process." *Wall v. Kholli*, 562 U.S. 545, 553 (2011). However, where "a reviewing court merely considers a judgment with a view to

9

amending or improving something *besides* that judgment . . . [it] is not an application for review of the judgment itself." *Collins v. Ercole*, 667 F.3d 247, 251 (2d Cir. 2012).

Therefore, "[m]otions 'for post-conviction discovery' and 'for appointment of counsel,' like those in issue here, 'generally are not direct requests for judicial review of a judgment and do not provide a state court with authority to order relief from a judgment.'" *Montalvo v. Lavalley*, No. 2:11-CV-5200, 2014 WL 6909513, at *6 (E.D.N.Y. Dec. 8, 2014) (quoting *Wall*, 562 U.S. 545, 556 n.4 *& Collins*, 667 F.3d at 251 n.5); *see also Blue v. Medeiros*, 913 F.3d 1, 7 (1st Cir. 2019) (explaining that collateral review had not occurred "[e]ven though a judge must take a peek at the underlying claim to see if the merits are hopeless, [because] she has no authority to either alter the judgment or change the sentence.").

Thus, as the Second Circuit has explained, statutory tolling does not apply to state court proceedings where a petitioner "sought material he claimed might be of help in developing . . . a challenge [to his conviction]," because "if a filing of that sort could toll the AEDPA limitations period, prisoners could substantially extend the time for filing habeas petitions by pursuing in state courts a variety of applications that do not challenge the validity of their convictions." *Hodge v. Greiner*, 269 F.3d 104, 107 (2d Cir. 2001) (declining to apply statutory tolling during the pendency of petitioner's Article 78 proceeding which sought further discovery – specifically asking the County to pay for an attorney, expert and other services as well as directing CPS to produce documents about an investigation – to supplement the crime scene photographs petitioner had already obtained); *see also Santana v. Griffin*, No. 1:17-CV-3827, 2018 WL 1229860, at *4 (S.D.N.Y. Mar. 7, 2018) ("A state habeas petition that does not seek reexamination of a conviction or sentence, but instead seeks material to facilitate a post-conviction challenge, is insufficient to toll AEDPA's statute of limitations.")

(citing cases).

Under this body of law, Box's correspondence with the county court immediately prior to, and his subsequent filing of, his application for poor person status and his motions for appointment of counsel and funds for an investigator were all insufficient to trigger statutory tolling because none of them challenged the validity of his criminal conviction.  Article 440 of the New York Criminal Procedure Law "codifie[d] the common-law writ of error coram nobis [and] permits the court in which a judgment of conviction has been entered . . . to vacate the judgment on several enumerated grounds[, i]nclud[ing] . . . that the judgment was obtained in violation of a right under the constitution . . . of the United States." *People v. Harris*, 109 A.D.2d 351 (2d Dep't 1985)*, appeal denied by*, 66 N.Y.2d 919 (1985).  However, petitioner's aforementioned application and motions were precursors to the 440 motion that represented the collateral challenge to petitioner's state court conviction.

Any argument that petitioner's poor person application and associated motions were mistakenly construed as the initiation of his 440 motion is untenable.  The county court's decision denying petitioner's application and motions indicated that petitioner did not either currently or formerly have a 440 motion pending before it.  The county court made a clear delineation between the two, illustrated by the court's reasoning for denying petitioner's request for court-appointed counsel since such a request could only be granted if the court decided a hearing was required in connection with a pending 440 motion, and no 440 motion had been filed.  Petitioner's application and motions were not a challenge to, or a request for reexamination of, his conviction.  Instead, they were designed to help him best facilitate and most effectively present his strongest arguments in a subsequently-filed, collateral, post-conviction challenge.

Furthermore, petitioner himself has acknowledged this fact.  First, in his actual application before the county court, when he explained that he required an attorney and investigator "in order to properly file a 440 . . . motion."  SCR at 20.  Second, in his supporting affidavit filed with the pleading in the instant action, where petitioner again states that all of these requests were "in order to file a CPL 440.10 motion properly."  Pet. Aff. at 2.  Consequently, petitioner's own representations indicate his understanding that the application and motions were separate and distinct from, and pursued in anticipation of eventually filing, a challenge to his state court conviction.

Despite petitioner's unequivocal assertions to the contrary, this situation is identical to that which the Second Circuit contemplated in *Hodge*.  Petitioner was hoping that further exploration into the medical reports and other evidence that was presented during the criminal trial with different experts and counsel, as well as additional investigation and discovery into the alleged police corruption which motivated the law enforcement officers' purported false testimony and conclusions, would ultimately lead to material to help him develop more persuasive arguments to later successfully challenge his criminal conviction.  *See* Dkt. No. 20 at 15-35 (detailing the perceived deficiencies in the scientific evidence and expert testimony and outlining the alleged false testimony and conclusions asserted by law enforcement which unlawfully supported petitioner's criminal conviction); Dkt. No. 21 at 8-39 (same).  Therefore, statutory tolling is inapplicable to the time between February of 2021 and the motion's denial in May of 2021.

However, statutory tolling is still relevant for calculating the timeliness of the instant action.  Petitioner's 440 motion was filed on September 20, 2021, commencing statutory tolling, after 252 days of the limitations period had expired.  The tolling continued through the

12

date of the Fourth Department's opinion, denying petitioner's application for leave to appeal, on May 2, 2022.  Petitioner then had 113 days remaining in the limitations period, or until August 23, 2022, to timely file the instant action.  Instead, the pleading was put in the facility's mailing system fifty-six days beyond the limitations period's expiration, on October 18, 2022.

Any argument that statutory tolling should extend beyond the Fourth Department's decision denying petitioner's leave application, specifically to either the Court of Appeal's decision dismissing petitioner's leave application or the subsequent motion denying petitioner's request for reconsideration, is unpersuasive.

> In New York, "any adverse or partially adverse order of an intermediate appellate court" may be "taken to the court of appeals" if "a certificate granting leave to appeal is issued pursuant to section 460.20."  N.Y. C.P.L. § 450.90(1).  Section 460.20, in turn, explains that a "certificate granting leave to appeal to the court of appeals . . . is an order of a judge granting such permission and certifying that the case involves a question of law which ought to be reviewed by the court of appeals."  N.Y. C.P.L. § 460.20.  When the order sought to be appealed is an order of the Appellate Division, either a judge of the Court of Appeals or a justice of the Appellate Division may issue a certificate granting leave to appeal to the Court of Appeals.  *See* N.Y. C.P.L. § 460.20(2)(a).  Together, these procedural rules establish that a party cannot appeal an order of the Appellate Division to the Court of Appeals without permission.
>
> Furthermore, an order denying a § 440.10 motion is appealable to the Appellate Division only by leave of a justice of that court granted under § 460.15.  *See* N.Y. C.P.L. § 450.15(1).  Absent that permission, "further appellate review is unavailable under [New York] state's procedures."  *Bennet*, 199 F.3d at 120.

*Davis v. Griffin*, No. 1:16-CV-0550, 2019 WL 1384587, at *2-*3 (W.D.N.Y. Mar. 27, 2019).

In sum, because New York law provides "no appeal to the New York Court of Appeals . . . from an order denying a motion for leave to appeal to the Appellate Division . . . once the

Appellate Division denie[s petitioner's] leave to appeal his section 440.10 motion, he ha[s] reached the end of the road within the state system." *Klein v. Harris*, 667 F.2d 274, 283-84 (2d Cir. 1981) (internal quotation marks and alterations omitted); *see also Friedman v. Rehal*, 618 F.3d 142, 152 n.3 (2d Cir. 2010) (declining to apply statutory tolling where "petitioner submitted an application for leave to appeal to the New York Court of Appeals, but the application was unauthorized under [New York] Criminal Procedure Law . . . and was dismissed," because "[a]n effort to exhaust state court remedies by procedures that are not authorized by state law does not toll the one-year statute of limitations.") (internal quotation marks and alterations omitted).

Box sought leave to appeal the denial of his 440 motion, and his application was denied by the Fourth Department.  Accordingly, petitioner had reached the conclusion of his state court remedies.  Petitioner did not receive permission to appeal that denial from either the Fourth Department or the Court of Appeals; therefore, his application to the Court of Appeals was not properly filed.  *Davis*, 2019 WL 1384587, at *2.  This was explicitly noted by the Court of Appeals in the decision denying the request: "[T]he order sought to be appealed from is not appealable under CPL § 450.90(1)."  SCR at 152.  Consequently, statutory tolling does not save the instant petition from being time-barred.

**B.  Equitable Tolling**

The other basis for tolling is rooted in equity.  Equitable tolling applies only in "rare and exceptional" circumstances.  *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000).  "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in

14

his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005) (citation omitted); *see also Smith*, 208 F.3d at 17.

> To show that extraordinary circumstances 'prevented' him from filing his petition on time, [P]etitioner must 'demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the [P]etitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances.

*Hizbullahankhamon v. Walker*, 255 F.3d 65, 75 (2d Cir. 2001) (quoting *Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000)).

Box argues that his application for poor person relief and contemporaneous motions for counsel and an expert were extraordinary prerequisites for filing his 440 motion because petitioner "knew without an expert to verify [his] claims, or an attorney to assist, the court would deny [him] post-conviction avenues based on 'insufficient facts' or 'conclusory claims' or upon the fact that [his] motion was pro se."  Dkt. No. 20 at 11.

In sum, petitioner appears to argue that his lack of legal education and inexperience with the law and its procedures constitute extraordinary circumstances that entitle him to equitable tolling.  However, "[m]ost courts . . . recognize that lack of knowledge and education about the law and one's legal rights is not an extraordinary circumstance because tolling for this common obstacle that most petitioners face would undermine the legislative decision to impose a one-year limitations period."  *Adkins v. Warden*, 585 F. Supp. 2d 286, 297 (D. Conn. 2008), *aff'd*, 354 F. App'x 564 (2d Cir. 2009), *cert. denied*, 562 U.S. 953 (2010) (citing cases).  Similarly, petitioner's pro se status is also insufficient to merit equitable tolling.  *See e.g. Smith*, 208 F.3d at 18.

Moreover, petitioner cannot assert that he pursued his claims diligently.  In June of

2020, petitioner's attorney advised him of three options to challenge his state court conviction.  Ex. at 18.  The first was through a 440 motion (which petitioner was warned he would have to file pro se if the attorney could not argue a non-frivolous ground for relief).  *Id.*  The second two were in federal court and were subject to strict time lines, which the attorney outlined for the petitioner.  *Id.*

Almost fifteen months passed between petitioner receiving that letter and filing his 440 motion.  *Compare* Ex. at 18 *with* SCR at 34-68.  Further, another fifteen months passed between petitioner writing this Court a letter – acknowledging that his statutory limitations period had almost expired and he required further tolling of it – and receiving a prompt from the Clerk's Office – informing him that he did not have a case pending in the Northern District and his June 2021 letter request would not be accepted by the Court – and petitioner filing the instant habeas corpus action.  *Compare* Ex. at 28-29 *with* Pet. at 21.

Equitable tolling has been denied in similar circumstances, deeming the time periods too lengthy to constitute a diligent pursuit of an individual's rights when they are not accompanied by any reason for the delay.  *See Barrett v. United States*, 961 F. Supp. 2d 403, 409 (D. Conn. 2013) (finding petitioner's "inordinate delay in filing his petition – nearly seven months after his attorney explicitly informed him of his right to do so – precludes any finding or reasonable diligence.") (citing *Belot v. Burge*, 490 F.3d 201, 207-08 (2d Cir. 2007) (affirming district court's decision that petitioner was not entitled to equitable tolling because "the petitioner ought reasonably to have begun his preparation earlier and filed an unpolished-but-timely-petition rather than wait to file his more polished petition . . . the week that the deadline expired.") (internal quotation marks and alterations omitted); *see also*

16

*Rodriguez v. Smith*, No. 9:14-CV-1274 (BKS/ATB), 2015 WL 5968837, at *7 (N.D.N.Y. Oct. 13, 2015) ("A period of delay greater than one year normally does not demonstrate due diligence."); *Bellamy v. Fischer*, No. 1:05-CV-2840, 2006 WL 2051038, at *5 (S.D.N.Y. July 24, 2006) ("[Petitioner] sat on his rights for nearly two years, and thus clearly failed to pursue his rights diligently.").  The same holds true here.

Consequently, petitioner has failed to establish either an exceptional circumstance or the diligent pursuit of his claims; therefore, equitable tolling will not save the untimely petition.

### C. <u>Equitable Exception</u>

Finally, courts have also recognized a further equitable exception to the one-year statute of limitations under 28 U.S.C. §2244(d)(1) in cases where a petitioner can prove actual innocence.  *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013).  It is important to stress that "[o]nce guilt is . . . established . . . a federal habeas court will not relitigate the question of guilt for a state defendant who protests his actual innocence . . . [r]ather, a federal habeas court will review state convictions for constitutional error."  *Hyman v. Brown*, 927 F.3d 639, 656 (2d Cir. 2019).

An actual innocence claim will be recognized only in a "narrow class of truly extraordinary cases [where a petitioner can] present[] credible and compelling claims of actual innocence."  *Hyman*, 927 F.3d at 656 (citing *Schlup*, 513 U.S. at 315) (internal quotation marks omitted); *see also House*, 547 U.S. at 538 (noting that the actual innocence gateway standard is "demanding and permits review only in the extraordinary case.") (internal quotation marks omitted).  "The petitioner's burden in making a gateway showing of actual innocence is deliberately demanding."  *Hyman*, 927 F.3d at 656 (citing cases).

"To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts or critical physical evidence–that was not presented at trial." *Schlup*, 513 U.S. at 324; *see also Rivas v. Fischer*, 687 F.3d 514, 518 (2d Cir. 2012); *Whitley v. Senkowski*, 317 F.3d 223, 225 (2d Cir. 2003).  In addition, "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House*, 547 U.S. at 536-37 (quoting *Schlup*, 513 U.S. at 327);[15] *see also Doe*, 391 F.3d at 160-62.

"The standard's demand for evidence *of innocence* references factual innocence, not mere legal insufficiency." *Hyman*, 927 F.3d at 657 (quoting *Schlup*, 513 U.S. at 316 & *Bousley v. United States*, 523 U.S. 614, 623-24 (1998)) (internal quotation marks omitted). In clarifying what this standard requires, the Second Circuit explained:

> a reviewing court assessing the probability of actual innocence is not limited to the trial record.  To the contrary, it "must consider all the evidence, old and new, incriminating and exculpatory," *House v. Bell*, 547 U.S. at 538 . . . (internal quotation marks omitted), and, in doing so, "is not bound by the rules of admissibility that would govern at trial," *Schlup v. Delo*, 513 U.S. at 327 . . . This is because, at the gateway stage of inquiry, a habeas court's task is not to identify trial error or to delineate the legal parameters of a possible new trial.  It is to identify those cases in which a compelling showing of actual innocence would make it a manifest injustice to maintain conviction unless it was free of constitutional error.  Thus, incriminating evidence obtained in the course of an unlawful search, or custodial admissions made in the absence of Miranda warnings, may well be inadmissible at trial.  Nevertheless,

---

[15] *Schlup* and *House* involved procedurally defaulted claims.  *See McQuiggan*, 569 U.S. at 386.  The Supreme Court in *McQuiggan* held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* and *House*, or, as in this case, the expiration of the statute of limitations."  *Id.*

> such evidence is properly considered in assessing factual
> innocence, with the manner of procurement informing reliability and
> relevance and, therefore, weight.

*Id.* at 658.

Here, petitioner cannot meet this high burden. First, petitioner must show the existence of newly discovered evidence that is compelling and reliable because it is either scientifically derived, credible eye witness testimony, or critical physical evidence. *See Schlup*, 513 U.S. at 324. However, petitioner has generally failed to introduce any new evidence and, that which he does, is neither compelling nor reliable.

Specifically, petitioner "assert[s] the destruction of evidence, namely the knife, chairs, blood evidence, and . . . the non-testing of every piece of evidence," are what need to be revisited to demonstrate his innocence. Dkt. No. 20 at 21-23. Petitioner contends that the knife, that was never recovered, would show that the victim "was [the] aggressor [because ]his finger prints should not be upon [the] knife [that petitioner] owned." *Id.* at 23.[16]

Further, petitioner contends that chairs in the room where the altercation took place would have bloody finger prints on them from the victim, proving a continued attack, which would be further bolstered by the non-existent blood evidence which would have "show[n] a prolonged struggle". *Id.*[17] Finally, petitioner contends that, had an investigation been done into the victim's personal circumstances, it would have uncovered that he was a sexual

---

[16]   There was additional testimony provided by law enforcement about the whereabouts of the knife, specifically that a search occurred where petitioner indicated he disposed of the knife which was again repeated in the spring when the snow had melted; however, it was not recovered. Dkt. No. 16-1 at 711, 731-32, 851-52, 931.

[17]   There was testimony from one of the officers about two overturned chairs in the victim's house. Dkt. No. 16-1 at 838-39 (explaining that petitioner indicated that the victim threw one of the chairs at him after he stabbed the victim).

predator, which would have also bolstered petitioner's assertions of self-defense in attempts to ward off an attack. *Id.*[18]

First, petitioner must show that the evidence is newly discovered, so that it "could not with due diligence have been discovered before or during trial." *United States v. White*, 972 F.2d 16, 20 (2d Cir. 1992). However, testimony was elicited from various sources during the trial about the knife, the chairs, and the victim's personal circumstances. Accordingly, to the extent petitioner contends that any of his prior arguments involve new evidence, they are meritless because all of this information was not only known to the parties during the criminal trial, it was a topic of continued discussion.

Second, petitioner overwhelmingly relies on the absence of physical evidence and scientific test results and asks the Court to engage in speculation and conjecture to arrive at the conclusion that such information was intentionally omitted from the trial so that petitioner was prevented from establishing he is actually innocent based on self-defense. However, such "alleg[ations] that the prosecution destroyed material evidence [without] . . . submitt[ing] any new evidence in support of his self-defense theory," has been deemed insufficient to establish actual innocence. *Saunders v. Comm'r Dep't of Correction*, No. 3:10-CV-0410, 2011 WL 572313, at *4 (D. Conn. Feb. 15, 2011) (declining to apply the actual innocence gateway to consider an unexhausted habeas petition); *see also Bruson v. Att'y Gen. of New Jersey*, No. 2:17-CV-6310, 2021 WL 4623296, at *3 (D.N.J. Oct. 7, 2021) (finding that the actual innocence gateway was inapplicable where petitioner "presented no new evidence in support or his innocence . . . [and] instead . . . speculates as to what may result if a DNA test

---

[18] There was limited testimony that indicated that the victim spoke with other men, via Craiglist, in apparent attempts to solicit sexual encounters, often with younger men. Dkt. No. 16-1 at 822-24, 853-55, 867-872

is conducted and if such a test returns verdicts in his favor.")

Arguably, petitioner does attempt to advance three new pieces of evidence/legal theories based upon his own individual testing and analysis.  First, petitioner seeks to admit the results from a self-created and self-administered test, including illustrations and explanations, which refute the trial testimony that the wound found on petitioner's hand was caused by his hand slipping down the blood-covered knife while he was stabbing the victim as opposed to when petitioner grabbed the knife away from the victim in an act of self-defense.  Dkt. No. 20 at 30-32; Dkt. No. 21 at 33-34; *see also* Dkt. No. 16-1 at 610-11 (testimony from one of the officers about his professional experience investigating stabbings and the conclusions and rationale he arrived at when he saw petitioner's wounds on his hands), Dkt. No. 16-1 at 728 (recounting how petitioner indicated he grabbed the knife from the victim during the struggle).

Second, petitioner proffers a hypothesis refuting the conclusion that the victim was alive at the time the fire was set and provides an alternative explanation why the medical examiner found soot in the victim's lungs and carbon dioxide in his blood.  Dkt. No. 21 at 25, 37-39; *see also* Dkt. No. 16-1 at 1162-64 (testimony from the medical examiner concluding that the victim was alive when the fire commenced as evidenced by the soot in his trachea and lungs).

Third, petitioner conducted his own review of pictures of the victim's pants, which were in evidence, and showed tears in the denim.  Dkt. No. 21 at 17, 21.  Petitioner opines that the tears are indicative of evidence tampering by law enforcement after the fact, as opposed to being inflicted upon the victim by petitioner during their altercation, and "[w]ith scientific tests none of this prejudicial testimony would be possible."  *Id*. at 21.

But even assuming that these self-generated documents and theories can properly be considered new evidence, they are far from "reliable" or "compelling."  These documents are not scientifically supported, as evidenced by petitioner's requests for further confirmatory testing to support the conclusions petitioner presumes will eventually be proven to be true.  *See* Dkt. No. 21 at 21 (insisting the need for further scientific testing to refute the allegedly untrue representations the prosecutor made to the jury about the tears in the victim's jeans); *id.* at 36 ("Due to . . . [petitioner's] tests [regarding the knife wound to his hand], and as [he] hope[s] expert review, will outright show these officers statements are false[.]"; *id.* at 37-38 (expressing petitioner's desire to review his hypothesis about the soot and carbon dioxide with an expert because petitioner has not had the opportunity to do so before).

Further, they are not generated by recognized scientific protocols or derived from a credible or trustworthy eyewitness, but instead appear to be self-serving exculpatory statements proffered by a party to the case.  *See Colon v. Sheahan*, No. 1:13-CV-6744, 2016 WL 3919643, at *16 (S.D.N.Y. Jan. 13, 2016) (holding that "bare affidavits with no support proof, documentary or otherwise," are "not sufficiently reliable.").

Finally, these three tests did not rely upon the discovery of, or otherwise produce, critical physical evidence.  Instead, the information petitioner seeks to have the Court rely on are unverified conclusions, based upon the musings of an interested individual with a vested interest in the outcome of the petition, yet with no apparent specialized knowledge or skill to produce legitimate, verifiable, and reproducible results.  *See Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("To demonstrate innocence so convincingly that no reasonable juror could convict, a prisoner must have documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips,

photographs, and phone logs to back up the claim.").

This is further compounded by the fact that "the State presented evidence [during the trial] undermining [petitioner's] claim of self-defense." *Saunders,* 2011 WL 572313, at *3-*4. Specifically, petitioner's statement to the police ultimately admitted to stabbing the victim with a knife until he collapsed, unresponsive on the floor. *Box*, 181 A.D.3d at 1238; *see also* Dkt. No. 16-1 at 708-709 (recounting petitioner's statement, given to a law enforcement officer, that petitioner "felt threatened, he was defending himself, and ultimately end[ed] up stabbing [the] victim twice in the chest, once in the shoulder," and that the victim then tried to advance so petitioner "continue[d] to thrust the knife into [the victim] . . . swinging wildly [to] demonstrate[] this in the interview, and that [petitioner] . . . fe[lt] like he [wa]s winning, but he continue[d] to stab [the victim] until [the victim] goes down and ultimately isn't really responding anymore."); Dkt. No. 16-1 at 727-28 (explaining that in a video recording of petitioner's statement he admitted to killing the victim, by stabbing him, multiple times, as well as setting the victim's house on fire by igniting the towels which were covering the victim's body); Dkt. No. 16-1 at 837 (statement from another officer that petitioner admitted to stabbing the victim five to ten times); Dkt. No. 16-1 at 917- 931(testimony from officer who videotaped and procured petitioner's written statement, confirming that petitioner provided several different accounts of what occurred on the night of the altercation).

Petitioner also provided explanations to multiple members of law enforcement about why he did not flee the altercation, such as he needed a ride home, he did not want to call a friend to ask for a ride, and the walk back to his house was very long and would be on snow-covered sidewalks. Dkt. No. 16-1 at 709-710, 840-42. Petitioner admitted, in response to one officer's questioning, that he could have left the scene during the altercation, but then

23

would quickly include a reason for why he failed to, such as being confused or panicked. Dkt. No. 16-1 at 842.

Moreover, testimony from a forensic psychiatrist who interviewed petitioner to determine if there was an applicable mental health defense for the criminal charges lodged against him noted that petitioner could not provide "a coherent story at all" about the altercation, which the doctor felt "didn't really add up [because i]t didn't match the physical evidence."  Dkt. No. 16-1 at 1240, 1242, 1262-63.  Further, the doctor noted that while petitioner "said several times that his actions were in self-defense . . . he couldn't explain . . . exactly how his safety was threatened or how that self-defense justified or brought about his specific actions, especially stabbing so many times."  *Id.* at 1263.

In conclusion, because "there were so many inconsistencies about [petitioner's] reporting, in terms of his confession, his interrogation and his account as he described it to [the psychiatrist]," the doctor did not feel that petitioner's "account was reliable enough [to receive] . . . strong consideration."  *Id.* at 1264.  In fact, the doctor concluded that, in his opinion, "the behavioral evidence of how the crime occurred did not comport with a self-defense strategy."  *Id.* at 1282; *see also id.* at 1282-83 (explaining rationale behind professional opinion and conclusion).

Indeed, Box himself confirmed that he (1) owned and brought the knife to the victim's house; (2) disposed of the knife after the altercation by throwing it in the backyard, and (3) admitted to intentionally starting the fire, which the prosecution intimated was of such severity to destroy vital evidence, after the victim collapsed, fatally wounded, to the floor.  Dkt. No. 20 at 20, 25; Dkt. No. 21 at 8; *see also* Dkt. No. 16-1 at 706-708 (testimony from law enforcement that (1) after providing several different versions of what happened and who

produced the knife, petitioner admitted that he brought the knife to the victim's home for his own protection and (2) petitioner "cover[ed] the victim up with towels . . . clean[ed] his wound up on his hand and finger, . . . [went] back out to the living room where [the] victim [wa]s laying, takes a tissue box that was next to the couch, takes it into the kitchen, lights the tissue box on fire, and then throws it on [the] victim, starting the fire in the residence."); Dkt. No. 16-1 at 836.

Consequently, despite petitioner's assertions to the contrary, his failure to provide new evidence to support his self-defense theory, in combination with the trial testimony which significantly undermines any claim that petitioner in fact acted in self-defense, fails to establish an actual innocence claim.

Finally, petitioner's assertion that revisiting evidence which was previously not tested prior to trial will result in impeachment evidence which can be used to discredit the law enforcement officers' testimony is also unavailing.  Dkt. No. 21 at 11-13.  "Indeed, the Supreme Court has stated that newly discovered impeachment evidence is a step removed from evidence pertaining to the crime itself and tends only to impeach the credibility of the witness," instead of actually demonstrating actual innocence.  *Jones v. Annucci*, 124 F. Supp. 3d 103, 124 (N.D.N.Y. 2015) (citing *Calderon v. Thompson*, 523 U.S. 538, 563 (1998)) (internal quotation marks omitted).

As previously stated, petitioner's conviction remains supported by evidence that refutes his assertions of self-defense.  It appears the jury ultimately decided to disbelieve petitioner's account of what transpired, which is reasonable considering petitioner's present admissions that he was untruthful during his interview and statement with law enforcement as well as the trial testimony from law enforcement outlining petitioner's many different and

25

contradictory versions of the story of what transpired that night and the forensic psychiatrist's conclusion that petitioner's actions were not supported by a theory of self-defense.

Federal courts cannot disturb such credibility determinations for habeas relief. *See Love v. Martuscello*, No. 1:17-CV-6244, 2022 WL 2109244, at *8 (W.D.N.Y. June 10, 2022), *lv. appeal dismissed*, 2022 WL 17684817 (2d. Cir. Nov. 28, 2022), *cert. denied*, 143 S. Ct. 2441 (2023) (denying petitioner's argument that the factfinder "should have weighed the credibility of the witnesses differently and drawn alternate inferences from the proof," because "[n]either [courts] on direct appeal nor . . . federal habeas . . . [are] permitted to revisit the factfinder's determinations as to the witnesses' credibility and veracity.") (internal quotation marks and citations omitted).

In conclusion, the petitioner has failed to establish an equitable exception that will save his petition from being time-barred.

## V.  MOTIONS FOR COUNSEL, POOR PERSON STATUS & DISCOVERY

Because the petition must be dismissed as time-barred, petitioner's additional motions must be denied as moot. *Murphy v. Reid*, 332 F.3d 82, 85 (2d Cir. 2003) (denying motion to appoint counsel as moot where Circuit dismissed petitioner's appeal, seeking permission to file a successive federal habeas corpus action, for want of jurisdiction); *Constant v. Barr*, 409 F. Supp. 3d 159, 173 (W.D.N.Y. 2019) (denying motion for assignment of counsel as moot because the motion is rendered "futile because the case will be closed upon issuance of this Decision and Order" denying the petition); *Conception v. Brown*, 794 F. Supp. 2d 416, 423 (W.D.N.Y. 2011) (denying motion for discovery and evidentiary hearing as moot given the court's decision that the petition must be dismissed as time-barred).

## VI. <u>CONCLUSION</u>

Therefore, it is

ORDERED that

1. The petition, Dkt. No. 1, is **DISMISSED AND DENIED**;

2. Petitioner's additional application for poor person status, as well as his various motions for additional relief including court-appointed counsel, discovery, and an evidentiary hearing , Dkt. No. 21, are **DENIED AS MOOT**;

3. The Court declines to issue a Certificate of Appealability.  28 U.S.C. § 2253(c)); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)));

4. Any further request for a Certificate of Appealability must be addressed to the Court of Appeals, *see* FED. R. APP. P. 22(b); 2d Cir. R. 22.1; and

5. The Clerk shall serve a copy of this Decision and Order on the parties in accordance with the Local Rules.

IT IS SO ORDERED.


Dated:  November 8, 2023
        Utica, New York.

_____
United States District Judge

27